Wash, J.,
delivered the opinion of the Court.
This was an action of ejectment commenced in the Circuit Court by the plaintiff in error against the defendant in error, to recover the undivided moiety of a lot of ground in the City of Louis, containing 75 feet, French measure, by 120 feet, being the east half of a lot 120 by 150 feet, French measure, which'last named lot is the northwest quarter of block Wo. 57, as designated on the plat of the city of St. Louis. The defendant had a verdict and judgment, to reverse which judgment the plaintiff now prosecutes his writ of error in this Court. The evidence is all preserved by a bill of exceptions, from which it appears-that Jean Sidle dit Lajoye, the father of the plaintiff), about the year 1769) built a stone house on the northwest corner of the square or block Wo. 57and' had a garden; and enclosed the west half of the-square, the northeast portion of which he purchased from one Bon Varlet who had-settled upon it a-few-years before, and which includes the land in dispute;. and continued in possession of the same until he left this country for-France in 1792 or ’93 at which time he-removed and settled in Bordeaux, where he-continued to live up to . the 29th of December, 1817. Since which time he has not been heard from. About the year 1770, Jean Salle intermarried with one Marie Rose Panda, by whom he had a-son (the present plaintiff) and'a daughter (Helene Leroux.) When he removed from St. Louis to Bordeaux, he-took his<son withihim, and left his wife and daughter in possession of his house, who, together with Peter Primm the defendant, and his, Primm’S wife,, (the daug-hter-of Helene Leroux,) have continued ever since to occupy the northwest quarter of said block or square, the east half of the northwest quarter of which the-dbfendant had possessed exclusively since 1809. Eighteen months or two years after-Jean Salle removed to Bordeaux, his son the plaintiff! returned, and. *369 has ever since resided in the country, but not on the lot or square on which his mother and sister lived. Marie Rose, the mother of the plaintiff, died in 1830. From the time the plaintiff returned from France, up to the 29th of Dec., 1817, Jean Salle, the father, had no intercourse with his family. The manner of his removal and the circumstances attending it as detailed in the evidence, as also a letter received from him of the date of the 29th Dec., 1817, shows clearly that when he removed to Bordeaux in 1792, he intended to abandon his family and the country, and no intention could have been more fully acted out or persevered in. It was proved that Marie Rose, the mother of the plaintiff], died in 1830, at the advanced age of 104 years, and the witnesses slate Jean Salle, the father was, or appeared to be, as old as his wife; and not having been heard from since 1817, and being then about ninety years old, the plaintiff relies upon the presumption of his death, and claims as heir to his father the undivided moiety of the lot sued for; insisting, first, that the title of Jean Salle, his father, was a good and perfect one, according to the law of prescription, in force whilst the country belonged to Spain ; or else, that the act of Congress of the 13th of June, 1812, operated a confirmation to his father by virtue of his prior possession of the lot; and again, the plaintiff insists, that if it be hold that Jean Salle had no title by prescription, and that he had abandoned his possession, and could take nothing by the act of Congress of 1812; then he claims as heir of his mother, the moiety of whatever she was entitled to claim by virtue of said act. The defendant gave in evidence a deed of conveyance dated Oct. 21st, 1816, from the plaintiff and Marie Rose, his mother, and Helene Leroux, his sister, conveying to the defendant the west or corner half of the lot of 120 by 150 feet, above referred to; in which deed is the following clause : The grantors “ sell unto him, the said Peter Primm, his heirs and assigns forever, a certain town lot or parcel of ground, lying and being situate in the town of St. Louis aforesaid, containing one hundred and twenty feet fronting on Third Main street, by seventy-five on the rear, French measure, bounded westwardly by the aforesaid Third Main street, which separates the said lot from the lot of Rufus Easton, northwardly by a cross street which separates it from the lot of Paul Guitard, eastwardly by lot of Peter Primm,, and on which he now lives, and southwardly by lot on which Elijah Beebe now lives;” and insists first that the plaintiff’s father had no title by prescription, and that the act of Congress of 1812, operated a confirmation of the title to the mother, Marie Rose, and her son-in-law, Benjamin Leroux, who, with his wife, Helene, jointly possessed the lot within the moaning of the act; and secondly, that the deed from Marie Rose to Peter Primm above referred to, admittedd the title of the lot in dispute to be in Peter Primm, and that the plaintiff, as heir of his mother, is estopped from claiming any portion thereof. Upon this state of facts, various instructions were asked on the part of the plaintiff, which were refused, and on the part of the defendant which were given. It is not now our purpose to notice them in detail; hut to proceed to the examination of those of them only, on which the parties mainly rely, (i. e.) first, did Jean Salle acquire title by prescription to the lot in question ? The right of prescription has been heretofore but little discussed or investigated, and no decision, it is believed, has ever been made upon it in this Court. The doctrine, as it is to he collected from the Partidas, the digest of the civil law prepared for the Territory of Orleans in 1808, and from Febrero, leaves it somewhat doubtful, whether the right of prescription could ever arise as against the King. The principles upon which the right is founded according to Fabrero Lib. III, cap. II, S. 239 are, "first, for the pub- *370 lie good, to the end that the dominion of property might not remain for a long time or almost always uncertain. Second, to avoid the innumerable and perpetual suits which might otherwise originate. Third, that the possessors of property might not be always in dread of losing what they had honestly obtained ; and fourth, to punish the indolence of those who were tardy in recovering their property; so that they should impute the loss of it to themselves, since the law protects those who watch and not those who sleep. ”
In order to set up the right, as between private individuals,, on a possession short of thirty years, the title must commence in a fair and formal manner. The principal laid down in the civil code, and which is recognized both by the Partidas and Febrero, is, “ that a man who becomes possessed of an immoveable estate fairly and honestly, and by virtue of a just title, may prescribe for the same after the expiration of ten years, if the true proprietor resides in the Territory, and after twenty years, in case said proprietor resides abroad, ” see civil code, title prescription, sec. 11, art. 67. This is the authority upon which the counsel for the plaintiff mainly rely, in order to make out their title by prescription. A slight examination will suffice to show, that it has reference to individual. claimants, and cannot with any reason be made to apply to the King or Government. The King is never presumed to be absent from his dominions. His Territories are under the command and in the possession of his officers, and he cannot be charged with indolence in not resuming what had never been parted with. In looking a little further to other provisions of the law, it will be still more evident that the one relied on in this case, was not intended to authorize an individual to prescribe against the crown.
Prescription requires a continued, uninterrupted, peaceable, public and-unequivocal possession animo domini,.(i. e.) by one who is master, or who has good reason to think himself so, Civil Code, sec. 1, art. 38. And the circumstance of having been in possession by the permission or through the indulgence of another, gives no legal possession upon which to prescribe; but the person so obtaining possession, will be esteemed to hold for him who grants the indulgence or permission. Jean Salle, was among the first who settled in this country. When his possession of the lot in question commenced, it was known to all that the King was the proprietor of the soil, and had granted but little of it away to the settler’s.
Without a grant or permission to settle, obtained from the proper officer, no one could therefore feel authorized to consider himself master of a single foot of land, It was not in this new colony, as it was or might be presumed to be in Spain ; that the evidences of title commencing in regular and formal grants, had been lost or destroyed through lapse of time. As between individuals, a title commencing by permission or force or fraud, could not be prescribed for in less than thirty years. Salle’s possession, as against the government, cannot be placed upon a more favorable footing ; for, though he might have purchased a part of the lot in dispute of Bon Yarlet by formal sale, yet in order to build up the title on this purchase, Bon Varlet must have sold in good faith, believing at the time that he was the lawful owner, which it is clear he could not have done ; the law being, “ that he who alienates and he who receives the thing, must both act in good faith, believing they had a right to do so. ” (Partidas Law 18, p. 383.) It is next insisted on by the counsel for.Salle, (and they cite Partidas L. 21, p. 384, Civil Code, title prescription, sec III, art..65, p. 486, Febrero Lib. III, cap. 11, S. 490, in support of the position,) that thirty years’ possession however acquired, will give title against all the world, and they contend-. *371 that Salle’s possession was continued after he left the country in 1792 or ’3, since the law regards the possession of the wife and daughter as his possession, for the pur • pose of setting up the right of prescription. To this there are two answers, first, J Salle had openly abandoned his family and the country, without the purpose of ever returning to them, and so stopped thereby the running of the right; and second, the right must be set up by the actual possessor, who, as donee, vendee, alienee or heir, may join the prior possession of the donor, vendor, alienor or ancestor, to their own possession, and so make out the time required to set up the right in the particular case. J. Salle had neither the natural possession, as it is termed in the civil law, (which means an actual corporal common law possession pedis,) nor a civil possession, which is raised hy force of law, where the possession, instead of being relinquished or abandoned, is merely committed hy the proprietor to his family or agent with the purpose of resuming it again soon, ox at a time fixed or appointed. Let us now see if J. Salle could claim any thing hy virtue of the act of Congress of 1812, above cited. The express object of that act, was to confirm to the inhabitants of the towns and villages therein enumerated, the lots occupied or possessed by them, prior to Dec. 1803. The most liberal construction of the act, could not, we apprehend, extend its provisions further than to the legal representatives of the last legal owners or possessors, prior to, and at the period referred to in the act. J. Salle was not only not an inhabitant at the passage of the act, but he had ceased to be an inhabitant long before the period referred to. It would he too unreasonable to suppose that where different persons at different periods had succeeded to the possession of the same lot, that the act intended to confirm the title to each possessor, or that where the first possessor had abandoned or transferred his possession, the act intended, nevertheless, to confirm the title to him, upon the maxim invoked hy the plaintiff’s counsel, “ that the prior in possession is the better in right. ” It is not perceived that any principle of reason, justice or policy, could have moved the Congress of the United States to enact such a provision. The great object of the act was to quiet the villagers in their titles to property (so far as the government was concerned) which had been acquired, in many instances, by possession merely, under an express or implied permission to settle, and which had passed from hand to hand, without any formal conveyance. In such cases, possession was the only thing to which they could look, and talcing it for granted that those who were found in possession at the time the country was ceded, or who had been last in possession prior thereto, were the rightful owners, the confirmation was intended for their benefit. Marie Rose, with her son-in-law, Benjamin Leroux, (the husband of Helene,) had remained in possession of the lot from the time J. Salle left St. Louis in 1792 or ’3, up to the period fixed in the act of 1812; and they were the persons to whom the confirmation enured. The right of the plaintiff to recover in this action might have been readily disposed of so far as he claims title through his father, without having entered into the consideration of the doctrines of prescriptionsince,, from the record, it does not appear that J\ Salle is dead, and the plaintiff could not claim as heir whilst his father lives. The questions- arising fairly, however, and being considered essential to the final adjudication between the parties, it was thought best to notice them. The next question to be considered is, whether the plaintiff can claim as heir to his mother,.she being dead ? and if so, how much or to what extent ? Marie Rose and Benjamin Leroux, her son-in-law, were the inhabitants whose possessions the act of 1812 intended to confirm. The legal existence of Helene Leroux (who *372 lived with them) was merged in that of her husband so that she could acquire no title except through her husband. The confirmation, under the act, enured then, to Marie Rose and Benjamin Leroux only, who took each an undivided moiety. Upon the death of Marie Rose, her daughter Helene, became equally entitled with the plaintiff, to the undivided moiety of their mother, so that the plaintiff as heir to his mother, may rightfully claim and recover the one undivided fourth part of the lot sued for, unless it can be-held (as the counsel for the defendant contends) that as heir to his mother, he is estopped from asserting his title by the clause above recited, from the deed of conveyance executed to the defendant in 1816, by the plaintiff together with his mother Marie Rose, and Benjamin Leroux and wife. To dispose of this question it becomes necessary to examine the doctrine of Estoppels. It is insisted on the part of the plaintiff in error, that this deed to Peter Primm cannot estop him from recovering. The objection taken is, first, that this estoppel is uncertain in this, that the acknowledgment that the lot was Primm’s lot, does not show how much interest Primm had in the lot, whether he was lessee for years, or tenant for life or in fee. To support this position, 2 Coke Litt. 352, a. is cited.
The rule there laid down is, that every estoppel, because it coneludeth a man to alledge the truth, must be certain to every intent, and not to be taken by argument or inference. How it can make any difference to the plaintiff, whether the estate of Primm is for years or for life, is not easily understood. If it was Primm’s lot then, it continues to be his yet, since it is not shown that he has parted with it. When a thing belongs to a man he has dominion over it, to the full extent to which the law will give dominion in such thing. It is true, as argued by the counsel for Sail?, that Primm’s interest may have long ago expired. If so, it is for him to show that matter to qualify his general acknowledgment. It is next said that the rule is, that every estoppel ought to be a precise affirmation of that which maketh the estoppel, and not spoken impersonally. In this case, the affirmation that the lot is the lot of Peter Primm, is precise and clear, and accords with the rule. In Comyn’s Dig. vol. 4, p. 79, the same doctrine is laid down. There it is said, that if a thing be not directly and precisely alledged, it is no estoppel, the example given is, that if the defendant pleads within age, (to-wit) of the age of fourteen years and no more, and after judgment, brings error within seven years, and assigns error by attorney, he shall not be estopped to say that he was not of full age at the time error assigned. For the allegation after the viz. that he was fourteen years old no more, is not positive. This case shows what is meant by a precise allegation. The same author says, so is the law, if the matter of estoppel be by way of recital, and so is the law if it be alleged by way of supposal. Another rule is, that there will be no estoppel if the matter alledged be not material.
Under the authority of this rule, it is argued that the matter of estoppel in this case, is only intended to be a part of the description of the boundary of the lot, and as there is a good description without this part of it, it cannot be material. The case put in the book, (4 Com. Dig. 80,) shows what sort of immateriality is meant. The case is in debt on an obligation alledged to be made at A. in another action upon the same obligation, he may say that it was made at B., we know that in general it is true, that the place where an obligation was made, is perfectly immaterial; but in the case at bar, it is material whether the lot was Peter Primm’s lot or not. To prove that descriptions where they are unnecessary, may be disregarded as estoppels, 4 Cruise 517—’18 is relied on. This author in treating of recitals says, a mis-recital of *373 a former grant, will not invalidate a deed. The author says further, that it is laid down by Lord Coke, that a mis-recital does not invalidate, because it is no direct affirmation. This authority will not bear the party out. Here there is a direct affirmation that the lot on which Primm lived, was Primm’s lot. And the phraseology" in reference to Primm, differs from that made use of towards the other persons named-by way of description merely. Moreover, it is in proof that Primm’s house stood on-the spot where Bon 'Varlet first built, (i. e.) on the Eastern edge of the lot sued for, leaving some sixty or sixty-five feet between the house and the Eastern limit of the-lot sold to Primm in 1816 ; so that the reference to it, as the lot of Peter Primm, and on which he then lived, shows that an eye was had. to the extent of Primm’s lot, and that the whole of it was embraced in the clause recited. And this answers another objection raised by Salle’s counsel, that it does not appear whether Primm’s lot referred to in the deed, was seventy-five feet or seventy-fw.e inches,, or of any particular extent. As to descriptions in a deed, we are referred to the same author, (4 Cruise Dig. 308) where it is laid down that a lessee is not estopped by a de-, scription of the lands contained, in his lease, for this-is not the essence of the deed.. He may therefore show that what, in the lease, is- called meadow, has been sometimes ploughed. This case shows that as to the character of the property, the party is not tied down to an exact description.
On the other hand, the law appears to he, that a person shall always be estopped. by his own deed;, that is, he shall not be allowed to aver anything in contradiction. of what he has once- solemnly and" deliberately avowedl. In the case of Shelley v.. Wright, ( Willis Rep. p. 9,) it was decided that where it was recited in the condition, of a bond, that the obligor had received divers sums of money for the obligee, which he had not brought to account, but acknowledged that a balance was due to the ob-ligee, that the obligor was estopped to say that he had not received any money to the use of the obligee, see also as to this point, (4 Cruise 72, Co. Litt. 352 a.) According to our view of these authorities, we are of opinion that the plaintiff is estopped to alledge- that the iot which in 1816 he said was Primm’s lot, is not now Primm’s lot- It is next insisted that if the plaintiff be estopped by the deed, it can only be as to the title which he then had, and that he is not estopped as to any title which may have fallen on him. by descent from his mother who has since died. And here it is urged that the marriage and the rights of community still subsisted,, notwithstanding the abandonment and removal of J. Salle; and the property confirmed to Marie Rose by the act of Congress of 1812, became subject to the marital, rights of the husband, and so by the Spanish law could not be alienated by the wife,, whose deed of conveyance to Primm was null and void. If this position could he-maintained, it will be still seen, that the plaintiff could not recover in-this action,. since the death of J. Salle, to whom the property passed upon the- death of Marie Rose his wife, has not been proved or found by the. jury, from the presumptive evidence in the case. But let us look a little-into the Spanish law on this point,, and see how far the authority cited (Febrero lib. 1, co. 11, p. 238,) will'sustain the-position assumed by the plaintiff’s counsel'. It is laid down that property acquired-, during mai-riage is to he divided equally between the twm (husband and wife,) “if. they live together according to the provisions of the law, (2 tit. 9 lib. 5 Rnop.y which says that every thing the husband and' wife shall acquire or purchase whilst they are living together, shall belong to them both in moities; and if it be a gift of the King and.it be given to both,, the husband, and. wife may take it; and if it be *374 given to one of them, the one to whom it is given may alone have it,” &c. The author proceeds, “ the sage conclusion in the preceding number, holds good, and applies not only when the husband and wife live together, in the same town and house; but although they may be living in different towns or countries, provided the marriage and their mutual consent and union of wills continue, and no divorce has taken place. For example, if the husband be employed abroad, and the wife, because the climate is prejudicial to her health, or for any other just cause, remains in her own country ; or if the wife pursues one trafic in one part of the country, and the husband another in a different part, then in these and other like cases, the marriage and society and union or their wills subsist, although their bodies be separated, and so whatever one or the other, or both may gain, should be brought into community and be divided equally. Yet some maintain that in order for this (community) to take place, it is necessary that there should be simultaneous cohabitation; but this opinion has no solid foundation and may be disregarded, &c.; no person can feel much difficulty in applying these principles to the case at bar. J. Salle was not employed abroad with the purpose of ever returning; no society, or intercourse, or union of wills subsisted; on the contrary, the wife and family had been entirely abandoned for more than twenty years, without having even known of the existence of her husband. The presumption in law is, that he was dead, so that Marie Rose was in law a femme sole, with power to make a deed binding upon herself and all claiming under.
According to the English decisions, absence for seven years beyond seas without being heard from during that time, raised the presumption of death, and this from analogy to a British statute. We have a statute passed originally in 1807, respecting Bigamy, which declares that a person shall not be subject to the penalties of the act whose husband or wife shall have been continually beyond seas for seven years, (see Rev. Code, p. 307). Seven full years bad elapsed after the passage of this act, when the deed was made by Marie Rose, to say nothing of the period elapsed before. We are therefore of opinion that the mother of the plaintiff did, by her deed, estop herself from claiming the lot now sued for, and that consequently the plaintiff, who claims through her, is estopped. The judgment of the Circuit Court is therefore affirmed with costs.